# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-60557-CIV-ALTMAN/Hunt

**A&E ADVENTURES LLC**,

    *Plaintiff,*

*v.*

**INTERCARD, INC.**,

    *Defendant.*

_____/

## ORDER GRANTING SUMMARY JUDGMENT

A plaintiff claiming economic loss must produce *evidence* to justify the amount of that loss. The plaintiff, it's true, need not prove damages with exactitude—to the last cent. Some degree of uncertainty is natural in these cases and won't, generally speaking, preclude recovery. But, to survive summary judgment, the plaintiff must adduce *some* evidence of damages—something concrete with which a reasonable jury can do more than guess at a "mere conclusion" from the "highest level of abstraction."

Our Plaintiff fails this standard here. Alleging that the Defendant sold it defective machines— in breach of certain warranties and in violation of Florida's consumer-protection law—the Plaintiff seeks to recover (what it says is) the diminished value of the machines. But the Plaintiff has no evidence of the machines' market value *as delivered*—an indispensable component of its damages case. This doesn't mean that the Plaintiff needs to *conclusively prove*, at this stage, the difference between the market value as promised (X) and the value as delivered (Y). This kind of market analysis is admittedly an inexact science—a kind of shifting, evolving reality that would typically require us to put the question to a jury. But the *only* evidence of market value the Plaintiff has adduced is the price of *different* machines it bought from a *different* company three years *after* it purchased the Defendant's products.

Even combined with testimony from the Plaintiff's executive—to the effect that the new machines had some of the features that didn't work as well in the Defendant's older machines—this evidence is insufficient for a reasonable jury to ascertain the Plaintiff's damages.

For starters, there's nothing in the record to suggest that the two machines—of different "makes" and "models"—were generally comparable. To the contrary, the undisputed evidence suggests that they differed in salient ways—thus rendering purely speculative any attempt to use the second machine as a market analogue for the first. Worse, the Plaintiff's sole method for computing damages is to subtract the old machines' price from the new ones'. But that computation indicates only (and unsurprisingly) that the Plaintiff paid *less* for older machines with *fewer* features than it did, three years later, for newer machines with *more* features. This formula thus establishes nothing at all.

The Plaintiff advances some other damages theories—all unpersuasive. The Plaintiff asks, for example, for a reimbursement of the purchase price of the old machines' software because (the Plaintiff says) Florida's consumer-protection law contemplates a full refund when a product's defects render it *completely* valueless. But the Plaintiff concedes that the old machines' software was functional and that it used that software for years as part of its everyday business—concessions that defeat this argument altogether. The Plaintiff also tries to collect on certain amounts it paid to third parties for ancillary items, but it unambiguously waived these damages in discovery. And the Plaintiff's claim for the full purchase price of the old machines—or, alternatively, the price of the new ones—likewise fails. Because the Plaintiff never rejected (or properly revoked acceptance of) the Defendant's machines, it isn't entitled to a refund or replacement under Florida's commercial code.

As this summation makes plain, the Defendant's motion for summary judgment is **GRANTED**.

THE FACTS[1]

The Plaintiff, A&E Adventures LLC ("A&E"), operates entertainment and gaming centers throughout the State of Florida. Def.'s SOMF ¶ 2. From 2010 to 2015, at two of its locations, A&E used a card-reader system—for customers to swipe, pay for, and activate arcade games—that had been manufactured by a company called "Sacoa." *Id.* ¶ 4. But A&E felt that it had "reached the limits" of the Sacoa system's functionality. *Id.* ¶¶ 4–6. Conveniently, in 2015, it was preparing to open a new gaming center in Florida, so it used this opportunity to look for a new card-reader system. *Id.*

Enter the Defendant, Intercard, Inc. ("Intercard"), which manufactures "magnetic strip card hardware and software" for various industries, including gaming centers, like A&E. *Id.* ¶ 1. A&E's managing member, Michael Abecassis, met with an Intercard salesperson, Jason Mitchell, at a trade conference in early 2015. Pl.'s SOMF ¶ 58. There, the pair discussed the possibility that A&E might transition away from Sacoa and to Intercard. *Id.* Abecassis explained that A&E was looking for systems that would *both* work well across its various locations *and* integrate seamlessly into its food-and-beverage operation, which A&E operated through a point-of-sale system called "Micros." *Id.* ¶ 59. Intercard, Mitchell insisted, had just such a product. *Id.* ¶ 60. According to Mitchell, its system had an "enhanced interface" that could connect to Micros and consolidate A&E's gaming operation with its food-and-beverage business. *Id.* Plus, Mitchell explained, the Intercard system could operate in either "credits" or cash;[2] its QR-code application could create coupons for customers after they made certain purchases; and it would accurately record a customer's transaction history. *Id.* ¶¶ 67–69. Mitchell also said that Intercard's system had certain important features that Sacoa systems lacked. *Id.* ¶¶ 61–64.

---

[1] To the extent the facts aren't disputed, we draw them from the Defendant's Statement of Material Facts ("Def.'s SOMF") [ECF No. 80], the Plaintiff's Statement of Material Facts ("Pl.'s SOMF") [ECF No. 98], and the Defendant's Reply Statement of Material Facts ("Def.'s Reply SOMF") [ECF No. 105].

[2] Credits (or tokens) are an internal currency. In a cash-based system, the cost of the game is represented in U.S. dollars. *See* Abecassis Dep. [ECF Nos. 80-2, 98-2] at 26:19–28:5.

For instance, Intercard could generate transaction reports, and it had "party reservation functionality" and "membership features"—none of which were found in the Sacoa system. *Id.*

Based on Mitchell's representations, A&E decided to replace the Sacoa system with Intercard. *Id.* ¶ 66. A&E and Intercard executed three separate contracts for the sale and installation of three systems. Def.'s SOMF ¶¶ 7–9. From 2015 and into early 2016, Intercard installed its systems at A&E's three locations. *Id.* ¶ 10. When all was said and done, A&E paid Intercard $272,706.08 for the three systems[3]—plus $71,602.04 for "hosting and other goods and services." Pl.'s SOMF ¶¶ 32–33. A&E also paid a third party $83,066.61 for game cards that were only compatible with the Intercard system. *Id.*

The parties agree that Intercard's hardware—composed of kiosks and card readers, Def.'s SOMF ¶ 37—worked, and that A&E was able to use the machines "to generate income from 2015 to 2018[.]" *Id.* ¶ 11; Pl.'s SOMF ¶ 11.[4] The parties also agree that there were problems with the systems' software. A&E, for example, lists several defects, which Intercard doesn't dispute: (1) the consolidated functions didn't work and had reporting and security issues; (2) the systems didn't provide transaction histories, such as a customer's accumulation of prize credits; (3) the systems couldn't reconcile or accurately account for gameplay credits; (4) the systems' transaction history was limited to the 30 preceding days; (5) the systems didn't have membership functionality; (6) the systems didn't generate accurate reports; (7) the systems didn't have party-reservation functionality; and (8) the QR-code scanner worked intermittently and accepted coupons only for "free play," rather than for "reduced price play" or "bonus play," as promised. *Id.* ¶¶ 71–78; *see also* Def.'s Reply SOMF ¶¶ 71–78 (not disputing these defects).

---

[3] And, as A&E stipulates, "Mr. Abecassis *could and did* testify that the Defective Systems as delivered were worth what A&E paid." Pl.'s SOMF ¶ 36.
[4] A&E points out, however, that there is no evidence that the systems allowed A&E to generate *more* income than it would have earned had it just used coins. Pl.'s SOMF ¶ 11.

Again, A&E concedes that "other features of the Intercard software worked" and doesn't deny that it "used certain portions of the Defective Systems for over three years." Pl.'s SOMF ¶ 30. But it disputes that the software "always worked," as there was a "very busy Saturday" when the system crashed completely. *Id.* A&E also quarrels with Intercard's suggestion that the software "allowed" A&E to operate its business. *Id.* While it concedes that it used the systems, A&E says that the systems weren't at all "necessary" for its operations. *Id.*[5]

The parties tend to disagree about the cause of these defects. Intercard says that, when the parties signed the initial contract in early 2015, it understood that A&E would use cash rather than credits. *See* Def.'s SOMF ¶ 49. But, about a month after installation, A&E demanded that Intercard modify the systems to allow for credits. *See id.* ¶ 50. According to Intercard, most of the subsequent issues arose from that change, as Intercard clients who used cash generally didn't experience similar problems. *Id.* ¶¶ 51–53. A&E counters that, while there may have been a "correlation" between the use of credits and the defects, Intercard should have known the limitations of its own systems and shouldn't have overstated its systems' capabilities. *See* Pl.'s SOMF ¶ 51.

Whatever the cause of the problems, Abecassis emailed Intercard in February of 2016, expressing frustration and proposing to return the Intercard machines—possibly as part of a transition to another platform. *Id.* ¶ 80. In response, Mitchell acknowledged Intercard's failure to meet expectations, and Scott Sherrod, Intercard's CEO, sent a follow-up email giving his "word" that Intercard would "address all of [A&E's] concerns." *Id.* ¶ 82. Based on those representations, A&E decided not to transition away from Intercard. *Id.* ¶ 84. Intercard then attempted, over the next few months, to fix the problems A&E had identified—with limited success. Def.'s SOMF ¶¶ 56–57. A&E

---

[5] Again, A&E notes that Intercard has no evidence that the systems helped A&E make *additional* profits—that is, more money than A&E would have made without Intercard's system. Pl.'s SOMF ¶ 30.

posits that Intercard "did not invest what was needed to resolve" the defects and, for that reason, failed to fix the features that hadn't been working—namely, the membership features, the accounting in Micros, the enhanced reporting, the party-reservation application, and the QR-code functionality. Pl.'s SOMF ¶¶ 56–57.

Despite these problems, though, A&E continued to use its Intercard machines throughout 2016. In fact, at the end of that year, A&E contacted Intercard to solicit a quote for a fourth system, which A&E hoped to install at a new gaming location. Def.'s SOMF ¶¶ 12–13. Abecassis felt that, during the protracted negotiation over this fourth system (which lasted almost a year), an Intercard employee was "trying to change things that [Intercard] had already committed to"—mostly with respect to the price—and, as a result, Abecassis informed Intercard in November of 2017 that A&E was going with another provider *both* for that fourth location *and* for other, future projects. *Id.* ¶¶ 14–18; Pl.'s SOMF ¶¶ 14–18.

In early 2018, A&E bought a card-reader system from a company called Semnox and installed that system—instead of Intercard's—at the fourth location. Def.'s SOMF ¶¶ 19–20. In September of 2018, A&E began replacing the Intercard systems at its other Florida locations with systems manufactured by Semnox. *Id.* ¶ 22. Until it did so, however, A&E continued to use Intercard's systems—as it had since 2015. *Id.* ¶¶ 24–25. A&E says that the Semnox systems cost $393,452.00, and that those systems had the functionality Intercard had promised. Pl.'s SOMF ¶ 89.[6] In addition, at his deposition, Abecassis testified that the Semnox machines differed from Intercard's in other ways. So, for instance, he explained that the Semnox machines were "fully integrated," by which he meant that, unlike the Intercard machines, they didn't need to connect into a separate point-of-sale system.

[6] Intercard disputes this purchase price because, as discussed below, A&E objected to certain requests for—and ultimately did not produce—documents regarding the Semnox transaction. *See* Def.'s Reply SOMF ¶ 89. We resolve this dispute, as we must, in A&E's favor.

Abecassis Dep. at 80:3–12. And, Abecassis added, while Intercard used "magnetic stripes" for its cards, Semnox employed radio-frequency identification, which he described as a "cleaner, more stable technology" that Intercard couldn't sell "through Micros." *Id.* at 81:2–82:3.

Once A&E substituted Semnox for the Intercard systems in 2018, it resold some of the Intercard kiosks—which had cost A&E $6,699 apiece in 2015—for between $4,500 and $5,000 each. Def.'s SOMF ¶ 44. A&E was even able to resell some of its card readers—which had cost A&E $289 apiece in 2015—for between $100 and $150 each. *Id.* ¶ 45. A&E still has "remaining hardware," which it says is worth about $49,000. Pl.'s SOMF ¶ 90.

## PROCEDURAL HISTORY

In January of 2019, A&E sued Intercard in state court, asserting four causes of action: (1) breach of express warranty; (2) breach of implied warranty; (3) promissory estoppel; and (4) a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. § 501.201, *et seq.* *See* Complaint [ECF No. 1-1] ¶¶ 27–61. In the warranty counts, A&E alleged that, "as a result of the System malfunctions, A&E has sustained at least $500,000.00 in losses in purchasing the useless Systems, and additional losses . . . for sales that A&E was unable to make." *Id.* ¶¶ 32, 39.[7] In its promissory-estoppel count, A&E claimed that, in reliance on Intercard's promises to repair the Intercard systems, it "changed its position detrimentally by postponing plans to replace the malfunctioning Systems" and "sustained losses . . . for sales that A&E was unable to make due to the Systems' malfunctions." *Id.* ¶ 44. As for the FDUTPA claim, A&E averred that Intercard "[sold] goods that it should [have] know[n] [were] defective and not suited for their purpose, and then repeatedly

---

[7] A&E defined the "Systems" as the "'I3' reader system; fourteen (14) 'Itellers'[;] its 'Redemption Control' system; an online registration system at A&E's current kiosks; a mobile app system; an Intercard reporting system that was initially hosted by Intercard with the intent that the data would eventually be placed on servers belonging to A&E; and other similar systems from Intercard." Complaint ¶ 9.

promis[ed] to remedy the defects, but fail[ed] to do so," and added that Intercard's conduct subjected A&E "to the expense of products that [didn't] work for their intended purpose, and the resulting business losses," which were "aggravated by Intercard's repeated unfulfilled promises" to fix the defects. *Id.* ¶¶ 61–62. Intercard removed the case to this Court on March 1, 2019. *See* Notice of Removal [ECF No. 1].

On April 14, 2019, A&E sent Intercard its initial Rule 26 disclosures. *See* Pl.'s Initial Disclosures [ECF No. 105-1]. In those disclosures, A&E identified the three categories of damages it would be seeking in this litigation: (1) $5,000,000.00 for "Plaintiff's loss relative to its expectancy if Defendant's systems had worked as promised"; (2) $1,200,000.00 for "Plaintiff's expenses obtaining replacement systems that do what Defendant's systems were supposed to do"; and (3) $370,000.00 for "[a]mounts paid by Plaintiff to Defendant." *Id.* at 5. On November 21, 2019, as the parties were conducting discovery,[8] an attorney for Intercard emailed an attorney for A&E and asked: "you were going to confirm with your client that the damages sought in this case will be limited to the amounts paid to Intercard, as that may limit certain discovery." Def.'s SOMF at Ex. 2-9 ("Nov. 21, 2019 Email"). A&E's attorney responded on December 3, 2019 that he had "[c]onfirmed that the damages plaintiff is seeking are limited to what it paid Intercard (approx. $400k)." *Id.* ("Dec. 3, 2019 Email").

Nevertheless, Intercard requested documents from A&E regarding the Semnox transaction— along with evidence of any payments A&E made to third parties. *See* Def.'s Mot. to Compel Disc. [ECF No. 58-2] at 5 (seeking documents and communications regarding A&E's efforts to replace the Intercard systems); Def.'s Second Mot. to Compel Disc. [ECF No. 61] at 3, 4 (seeking records and communications relating to A&E's purchase of the Semnox systems—along with evidence of any

---

[8] The parties initially agreed to extend the fact-discovery deadline through February 29, 2020, and Magistrate Judge Hunt ordered additional, limited productions through April 27, 2020. *See* Order [ECF No. 101].

payments A&E made to third parties because of the Intercard systems' defects). In opposing those requests, A&E argued to the Court that its communications with Semnox weren't relevant. *See* Pl.'s Mem. Law in Opp'n to Def.'s Second Mot. to Compel ("Opp'n to Def.'s Mot. to Compel") [ECF No. 67] at 2. Based on that objection, the Magistrate Judge denied Intercard's discovery requests about the Semnox transaction—except as to the purchase price of Semnox's systems, which the Magistrate Judge ordered A&E to disclose. *See* Omnibus Order on Disc. [ECF No. 75] at 2 (the motion to compel "documents related to the purchase of the Semnox system and documents related to the transactions between Semnox and Plaintiff are DENIED," except to the extent that the "Plaintiff shall provide Defendant the price paid for the Semnox system"). A&E also told the Court that Intercard's request regarding third-party payments had been "resolved" because it "has not paid any amount to any third party as a result of the defects in the Systems, and thus has no documents responsive to [the request]." Opp'n to Def.'s Mot. to Compel at 3.

Intercard now moves for summary judgment on all four counts—primarily because (it says) A&E has failed to proffer *any* evidence of damages. *See generally* Def.'s Mot. Summ. J. ("MSJ") [ECF No. 79]. The MSJ is now ripe for adjudication. *See* Pl.'s Corrected Mem. of Law in Opp'n to Def.'s Mot. Summ. J. ("Response") [ECF No. 97]; Def.'s Reply Supp. Mot. Summ. J. ("Reply") [ECF No. 104]. This Order follows.

**STANDARD OF REVIEW**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its

very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the movant bears the burden of proving the absence of a genuine issue of material fact, with all factual inferences drawn in favor of the non-movant. *See e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the movant satisfies its initial burden, the burden shifts to the non-movant to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). The non-movant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must come forward with some affirmative evidence to support its claim. *See Anderson*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-movant "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50 (internal citations omitted).

## ANALYSIS

### I.    Waiver

In its MSJ, Intercard contends that A&E stipulated to a measure of damages "limited to what [A&E] paid Intercard," which A&E estimated at "approx. $400k[.]" MSJ at 4 (quoting Dec. 3, 2019 Email). A&E responds that, in the December 3, 2019 email, it "did not agree to a particular measure

of damages." Response at 10. Instead, A&E says, the email only confirmed that A&E was "*not seeking the lost profits* or productivity . . . given the difficulty of measuring and proving [the] same." *Id.* Because it now seeks to recover only its "out-of-pocket losses" of $427,374.73, A&E insists that it didn't waive any of the various types of damages that fall within that range. *See id.* (arguing that, if "A&E were to seek diminution damages in excess of $427,374.73, then Intercard might have a point," but maintaining that, because its "diminution damages do not exceed that amount, there is no inconsistency that might preclude the application of that measure of damages here").

We agree with A&E that it waived any claim to lost profits. But we disagree that "lost profits" was the *only* thing A&E waived. By confirming for Intercard that it would be seeking *only* the money it "paid Intercard," A&E unambiguously disavowed any *other* damages claim it might have had for payments it made to third parties. While this reading of the December 3, 2019 Email may seem obvious, A&E now hopes to retract its waiver and, in its opposition to summary judgment, asks for damages based on (1) the replacement costs of the Intercard systems—i.e., money it paid to Semnox, *see id.* at 16–17 (arguing that A&E can maintain its breach-of-warranty claims based on the $393,452.00 "in costs to obtain replacement systems (from Semnox) that performed as Intercard had warranted its systems would perform"); and (2) the money it paid certain third parties for game cards, *see id.* at 7, 14, 15, 19 (insisting that A&E can pursue its FDUTPA and breach-of-warranty claims based on game cards it bought from third parties). We pause here for a moment to note that this second category of third-party damages—money for game cards—appears nowhere in A&E's Initial Disclosures, *see generally* Pl.'s Initial Disclosures,[9] which is reason enough to disregard it, *see* Omnibus Order, *Vital Pharm., Inc. v. Monster Energy Co.*, No. 19-60809 (S.D. Fla. May 19, 2020), ECF No. 321 (striking a

---

[9] Nor (as far as we can tell) did A&E ever include these third-party expenditures in a supplemental damages report under Rule 26(e). *See generally* Docket.

damages claim where the plaintiff never disclosed the damages calculation under Rule 26(a) and didn't supplement its disclosures under Rule 26(e)).

In any event, as we explain below, these theories of third-party damages probably wouldn't stand on the record as it's currently constituted and are otherwise unavailable under the relevant causes of action. But the point here is that we need not entertain them *at all* because A&E knowingly and voluntarily waived any measure of damages that's based on payments it made to third parties—whether that third party is Semnox or someone else. Our consideration of these theories would prejudice Intercard, moreover, because it didn't have a chance to take discovery on A&E's third-party transactions. Indeed, A&E avoided the disclosure of documents regarding the Semnox transaction by arguing (successfully) that Semnox *wasn't at all relevant to its damages case.* Opp'n to Def.'s Mot. to Compel at 2. And it resolved the discovery dispute regarding third-party transactions by claiming that it "ha[d] not paid any amount to any third party as a result of the defects in the Systems." *Id.* at 3.

Nor need we spend much time on the antecedent legal question of whether the email—especially in conjunction with A&E's discovery representations to the Magistrate Judge—constituted a valid waiver. In opposition to the MSJ, A&E addresses only the *scope* of its waiver—conceding, by not suggesting otherwise, that it *did* waive something. *See* Response at 10. A&E could hardly have said otherwise. We (after all) let litigants waive things all the time—their right to counsel, for instance, *see Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent."); their civil claims or defenses, *see, e.g.*, FED. R. CIV. P. 12(h)(1) (providing that certain defenses are waived if not properly raised by motion, responsive pleading, or amendment); their freedom, *see* FED. R. CRIM. P. 11 (permitting guilty pleas). We even allow parties to forfeit arguments they *could have* made. *See, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue

waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). It's thus entirely uncontroversial to say that a party, acting through its lawyer, can relinquish an aspect (or, for that matter, *all* aspects) of its damages claim. *Cf. Heckler v. Montgomery*, 567 F. Supp. 2d 471, 473 (S.D.N.Y. 2008) ("Although he originally suggested that the arresting officers had used excessive force, [the plaintiff] has since waived any claim for personal injury and on that basis avoided having to disclose his medical records during discovery.").

And we should honor these waivers—not just, as we've said, because to do otherwise would be to prejudice the counter-party who, relying on the waiver, took no discovery on the stipulated question—but because the *system*, by which we mean (in the main) American justice, benefits from the respect we pay efficiency. Rule 1, for instance, admonishes us to "construe[ ], administer[ ], and employ[ ]" the Federal Rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." And it's by now banal to speak of the many ways in which we—as judges—impel, cajole, and encourage parties to streamline their cases, to resolve their differences, and to narrow the issues in need of adjudication. *See United States v. Orsini*, 907 F.3d 115, 119 (1st Cir. 2018) ("Waivers allow trial courts to narrow the issues and concentrate scarce judicial resources on genuinely contested matters—and when a trial court makes a reasoned decision, it is unfair to allow a party to subvert that decision by resurrecting a waived claim."). If you knew that, however voluntary your opponent's waiver, some enterprising judge *might* always be willing, late in the case—when you least expect it—to resurrect the forfeited claim and to spring it on you long after you've surrendered the chance to defend yourself against it, what reason would you ever have to negotiate in good faith with the other side?

What, one wonders, could you ever hope to achieve? No. A&E's waiver was pellucid—and that's the end of that.

Having so circumscribed the issues, we turn now to the merits.

## II.     FDUTPA (Count IV)

To prevail on a FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018). In our case, summary judgment turns on the final element—actual damages, which Florida law defines as "the difference in the market value of the product or service in the condition in which it was delivered according to the contract of the parties." *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1344 (S.D. Fla. 2011) (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984)). There is, however, one exception to this general definition: When a product is "rendered valueless" as a result of a defect, the "purchase price is the appropriate measure of damages." *Id.* at 1344 (quoting *Rollins*, 454 So. 2d at 585). That, though, is the full scope of permissible damages under FDUTPA. *See, e.g.*, *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. 3d DCA 2010) ("[U]nder FDUTPA, the term 'actual damages' does not include special or consequential damages."); *Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 263 (Fla. 2d DCA 2004) (explaining that FDUTPA "permits a consumer to recover only the diminished value of the services received," not "special, consequential, and incidental damages").

To survive summary judgment, therefore, the plaintiff must proffer some evidence of actual damages. *See HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1323 (M.D. Fla. 2016), *aff'd*, 703 F. App'x 814 (11th Cir. 2017) ("In order to survive [the defendants'] Motion for Summary Judgment, [the plaintiff] must point to evidence sufficient to allow a jury to reasonably find that it incurred actual damages, as measured under FDUTPA."); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, 2015 WL 3905018, at *33 (S.D. Fla. June 25, 2015) (granting summary

judgment where the plaintiff "failed to provide any evidence of actual damages despite a protracted and ample discovery period"). While the plaintiff need not calculate these damages with "mathematical precision," he may not advance a damages case that's based only on "speculation or guesswork." *Performance Orthopaedics*, 315 F. Supp. 3d at 1310 (quoting *United States v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988)). "The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." *Id.* (quoting *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985)).

A&E offers four theories of actual damages—all unviable. *First*, A&E argues that the Intercard systems' software component was completely "valueless," such that A&E should be entitled to the full purchase price of that component. *Second*, A&E tries to establish the Intercard systems' market value *as delivered*. *Third*, A&E insists on recovering certain additional monies (it claims) it wouldn't have spent but for the alleged FDUTPA violation. *Fourth*, A&E maintains that it incurred damages as a result of Intercard's unfulfilled promises to repair the systems. We address each in turn.

### A.     Valueless

We begin with A&E's argument that it can withstand summary judgment under the "valueless" exception to the "actual damages" element. A&E concedes that the systems' tangible hardware "has some resale value," but it argues that the *software* was valueless. *See* Response at 12. In support, it cites *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286 (M.D. Fla. 2009), for the proposition that, in conducting this "valueless" inquiry, courts may bifurcate a system's tangible and intangible components.

Even assuming, however, that the Intercard systems' hardware and software components are severable, there is still *no* evidence—and, therefore, no genuine issue of fact—that the software was *completely* "valueless." To the contrary, although A&E complains about the software's defects, *see* Pl.'s SOMF ¶¶ 71–79, it "does not dispute that other features of the Intercard software worked, and that it used certain portions of the [Intercard Systems] for over three years," *id.* ¶ 30. In saying so, of course,

A&E concedes that the software retained *some* value. It, after all, *worked*. And, because it worked, A&E's patrons used the Intercard systems *for years* to swipe their cards and play arcade games. The software may not have had all the bells and whistles A&E wanted. The software may even have been, in some respects, defective (as Intercard concedes). *See* Def.'s Reply SOMF ¶¶ 71–78. But that's not the same as saying that the software was *totally worthless*, such that A&E would be entitled to recover the *full price* of that component. *See Moore v. GNC, Holdings, Inc.*, 2014 WL 12634919, at *5 (S.D. Fla. Mar. 18, 2014) (granting summary judgment where the plaintiffs failed to provide "any evidentiary or legal support for their assertion that [a creatine supplement] was valueless" without the desired warning label, as there were "no indications that the Product—or any creatine monohydrate without a hydration warning—is wholly useless as a creatine supplement"); *see also Coffey v. WCW & Air, Inc.*, 2020 WL 4519023, at *7 (N.D. Fla. Mar. 25, 2020) (excluding as irrelevant expert testimony that water-treatment systems were completely valueless for purposes of FDUTPA where the plaintiffs testified at depositions that they had used the water tests for a few weeks, rendering their "full refund theory" procedurally and substantively unavailable).

Which leads us to the second problem with A&E's software-refund theory: A&E never gives us a price for the software component—never tells us, in other words, what the refund would be: $1? $10? $100? $1,000? $10,000? $100,000? No one can say. Nor does it offer *any* evidence from which that price could be rationally deduced. The Court—and, were we to get so far, the jury—would thus have no reasonable basis from which to calculate A&E's damages. This evidentiary lacuna provides ample grounds to reject A&E's claim. *See HRCC*, 302 F. Supp. 3d at 1323 ("In order to survive [the defendants'] Motion for Summary Judgment, [the plaintiff] must point to evidence sufficient to allow a jury to reasonably find that it incurred actual damages, as measured under FDUTPA."); *Tyco Integrated*, 2015 WL 3905018, at *33 (granting summary judgment where the plaintiff "failed to provide any evidence of actual damages despite a protracted and ample discovery period").

To be fair, A&E *does* propose a formula for calculating the price of the software. A&E suggests that we simply "subtract[ ] the resale value of the tangible hardware from the amounts it paid to Intercard." Response at 13. So, for example, if A&E purchased an Intercard system (composed of both hardware and software components) for $1,000 in 2015 and then resold only the *hardware* for $750 three years later, then (A&E posits) the software must have been worth $250 in 2015. But A&E's formula presupposes that the software was valueless—something we've just shown to be untrue. Nor does A&E's formula account for the inevitable depreciation in the hardware's value over time—think: three years in dark, frenetic arcade rooms with children kicking uncooperative machines, spilling their sodas, and liberally disposing of chewed gum.

Even putting these deficiencies aside, though, there's still no evidence in the record from which a reasonable jury could compute the software's purchase price. A&E notes that it resold "some" of the kiosks for between $4,500 and $5,000 and "some" of the card readers for $100 to $150. *See* Pl.'s SOMF ¶¶ 43–45. But it doesn't say which ones it sold, so we have no way of marrying the sales prices in 2018 with the purchase prices from 2015. *See generally id.* That, in turn, means that we can't actually compute the delta—as A&E suggests we should—between what the machines were worth in 2015 and what the hardware sold for in 2018. And, without this delta, we cannot use A&E's formula to recreate the software's value—either in 2018 or, especially, in 2015. To make matters worse, A&E never explains how many of the old Intercard systems it sold, so we're left to wonder *both* how much each individual software component was worth *and* how much the overall damages (*viz.*, all the software components combined) would be.

A&E also (apparently) has some "remaining hardware," which it values at approximately $49,000. *Id.* ¶ 90. Since this hardware was never sold, though, the appraisal couldn't have come via

A&E's proposed formula (2015 purchase price minus 2018 sales price). And A&E never explains how it appraised this hardware or whether (if at all) this hardware fits into its overall calculation.[10]

A&E's reliance on *Siever* is misplaced. In *Siever*, the plaintiffs were franchisee-owners who purchased from the defendants the exclusive right to use the defendants' trade name—along with a "start-up package and training" that would help facilitate the franchisee relationship. *See* 669 F. Supp. 2d at 1290. When the plaintiffs discovered that other businesses were using the defendants' trade name, they sued the defendants under FDUTPA. *Id.* To establish actual damages, the plaintiffs retained a CPA who opined that the plaintiffs' actual damages were the difference between (1) the total contract price and (2) the monetary value of the tangible items (plus training services)—thus implying, as A&E does here, that the trade name was completely valueless. *Id.* at 1294. The CPA didn't, however, conduct a diminution-of-value analysis—so the defendants argued that the plaintiffs' FDUTPA claim failed as matter of law because "actual damages, a required element of a FDUTPA claim, must be established by a showing of diminished value[.]" *Id.*

The court denied the defendants' motion, citing FDUTPA's "valueless" exception. *Id.* ("Where a product is rendered valueless by an alleged defect, the purchase price is an appropriate measure of damages." (citing *Rollins*, 454 So. 2d at 585)). "Considering the damages report in the light

---

[10] Nor did A&E offer anything like this calculation *either* in its initial disclosures, *see generally* Initial Disclosures, *or* (so far as this Court can tell) in any supplemental disclosure under Rule 26(e), *see generally* Docket. This omission is likewise fatal. *See also* FED. R. CIV. P. 26(a)(1)(A)(iii) (requiring parties to disclose "a computation of each category of damages claimed" and the evidence "on which each computation is based, including materials bearing on the nature and extent of injuries suffered"); FED. R. CIV. P. 37(c)(1)("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *see also RLI Ins. Co. v. Alfonso*, 2021 WL 430720, at *9–10 (S.D. Fla. Feb. 8, 2021) (explaining that non-disclosure under Rule 26 must be substantially justified or harmless and noting that the burden of showing substantial justification or harmlessness is on the non-disclosing party); Omnibus Order, *Vital Pharm.*, No. 19-60809, ECF No. 321 (striking a damages claim where the plaintiff never disclosed the damages calculation under Rule 26(a) and didn't supplement its disclosures under Rule 26(e)).

most favorable" to the plaintiffs, the court found that the plaintiffs had identified a triable question of fact. *Id.* Notably, the court explained, the expert could have determined that the defendants' failure to protect the exclusivity of their trade name rendered that name completely valueless. *See id.* And, if that were true, the CPA's calculation—the total purchase price minus the tangible items (plus training services)—*could have* represented the fair value of the trade name when it was purchased. *Id.*

*Siever* thus differs from our case in at least two main ways. *One*, the defendants in that case moved for summary judgment *only* because the plaintiffs had failed to show a diminution in value— and *not* (as Intercard contends here) because the plaintiffs had failed to produce evidence that the trade name was *completely* valueless. *See id.* ("While the [d]efendants are correct in noting that actual damages are a requisite element of a FDUTPA claim, diminished value is not the only acceptable measure of actual damages."). Here, by contrast, A&E stipulates that certain "features of the Intercard *software* worked," and that it used that software for more than three years to generate profits for its business. *See* Pl.'s SOMF ¶ 30 (emphasis added).

*Two*, the plaintiffs in *Siever* had an expert report, which they deployed to help establish the trade name's value. There was thus at least *some* foundation for the plaintiffs' damages computation. A&E, on the other hand, didn't get an expert to appraise Intercard's software, and (as we've explained) it doesn't plausibly allege that the software's price can be computed by subtracting the value of the hardware in 2018 from the total purchase price in 2015. *Cf. Performance Orthapaedics*, 315 F. Supp. 3d at 1310 (explaining that the proof of damages at summary judgment may be "indirect," but it must "rest on adequate data" (quoting *G.M. Brod & Co.*, 759 F.2d at 1539)).

A&E, in short, has no evidence that Intercard's software was "valueless"—either in 2015 or since.

### B.    Actual Damages

A&E next tries to show that it didn't receive the full benefit of its bargain. Response at 10–11. But A&E's only proposed method for calculating actual damages is to take $393,452.00—the purchase price of the Semnox systems it bought in 2018—and to subtract $272,706.08, the price A&E paid to Intercard in 2015. *See* Response at 11; *see also id.* (defining A&E's "diminution damages" as "the cost of the replacement systems (manufactured by Semnox) that actually perform the functions that Intercard had promised but failed to deliver, less the cost of the Defective Systems"). In other words, A&E wants us (1) to use the 2018 Semnox purchase price as a stand-in for the 2015 market value of the system Intercard promised (i.e., with all the desired features), and then (2) to subtract from the Semnox purchase price the money A&E paid Intercard for its systems in 2015.

A&E has it exactly backwards. To understand why, suppose that, in 2015, A&E bought a Ferrari for $100,000—only to realize later that the seller had fraudulently delivered a Toyota (worth, say, $50,000), which had been made to look like a Ferrari. In this scenario, of course, A&E would have a viable FDUTPA claim with damages of $50,000.[11] Even if A&E didn't discover the deception until 2018—by which point the price of the Toyota had depreciated to $40,000—A&E could easily compute its damages by comparing the price it paid ($100,000) to the price of the vehicle it got (the value of the Toyota back in 2015)—not too difficult an exercise, we shouldn't think.

---

[11] The purchase price a plaintiff was willing to pay for a product in an arms-length transaction is usually prima facie evidence of the market value of the product *as promised*—at least in the context of U.C.C. warranties. *See Mayberry v. Volkswagen of Am., Inc.*, 692 N.W.2d 226, 237 (Wis. 2005) ("[C]ourts generally hold that the contract price is relevant but not conclusive evidence of the value of the goods as warranted at the time and place of acceptance."); *K & C, Inc. v. Westinghouse Elec. Corp.*, 263 A.2d 390, 394 (Pa. 1970) (holding that the purchase price of goods is "prima facie [but not conclusive] evidence" of the value of the goods as warranted); 1 JAMES J. WHITE ET AL., UNIFORM COMMERCIAL CODE § 11:3 (6th ed. Nov. 2020 update) ("[T]he purchase price of the damaged goods may be the best evidence of the value of the goods as warranted.").

Suppose, however, that, in 2015, A&E paid $50,000 for a Toyota with special features—GPS, surround sound, seat warmers, a sunroof—only to discover, when the car was delivered, that those features didn't work. Suppose, too, that, in 2018, A&E bought a Ferrari that came with all these same features for $100,000. And suppose, finally, that, as A&E concedes here, the 2015 Toyota *as delivered* (i.e., with defective features) was worth what A&E paid for it ($50,000).[12] As this hypothetical—which, really, is on all-fours with A&E's proposed formula here—should make clear, A&E's methodology suffers from four dispositive flaws.

*One*, A&E's formula fails to show that A&E suffered any damages at all. As we've said, A&E agrees that "Mr. Abecassis *could and did* testify that the Defective Systems as delivered were worth what A&E paid." Pl.'s SOMF ¶ 36. As A&E correctly notes, a business owner can opine about the value of his property. *See* Response at 11; *see also Johnson v. Thor Motor Coach, Inc.*, 2016 WL 8939134, at *5 (M.D. Fla. Aug. 1, 2016) ("Under Florida law, an owner of property can be qualified to offer an opinion as to the value of his or her property." (citing *Chmura v. Monaco Coach Corp.*, 2006 WL 709325, at *4 (M.D. Fla. Mar. 20, 2006))). This concession that "the Defective Systems as delivered"—i.e., the machines *with* the defects—"were worth what A&E paid" establishes that A&E did *not* pay a price premium for the various features that didn't work, *cf. Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016) (explaining that, under FDUTPA, plaintiffs can recover the "price premium" they paid to a defendant); *Marty v. Anheuser-Busch Companies*, 43 F. Supp. 3d 1333, 1346 (S.D. Fla. 2014) ("[U]nder Florida law, a plaintiff who alleges that he or she has paid a premium price for a product as a result of a defendant's misrepresentation has pled damages under FDUTPA."). Had A&E shown that three base-model Intercard systems cost (say) $200,000, and that it paid an extra $72,706.08 for

---

[12] This could be true for any number of reasons—though two obvious ones come to mind: on the one hand, the features could be worth very little, such that their absence wouldn't alter the vehicle's overall value; on the other, the features might be worth a significant sum, even though their value wasn't factored into the car's price because (for instance) A&E managed to negotiate a favorable deal.

the features that ultimately didn't work, then it may have been able to pursue the difference ($72,706.08) in price-premium damages. But A&E never makes this argument. *See generally* Response. To the contrary—again—A&E admits that it *didn't* pay a price premium. Pl.'s SOMF ¶ 36. And the record doesn't appear to include any other evidence that might support a price-premium damages theory in this case. To return to our Toyota example, A&E paid $50,000 for a 2015 Toyota, and it received a 2015 Toyota worth $50,000. So, while the car—or machine—may have had some defects, A&E hasn't shown that those defects damaged it at all.

*Two*, A&E cannot use the 2018 Ferrari as a stand-in for the 2015 Toyota just because the 2018 Ferrari had the features that weren't working in the 2015 Toyota. *See* Response at 11 (arguing that the diminution value is "established by what A&E paid ($393,452.00) for the Semnox systems that replaced the Defective Systems and *actually did* all of the things that Intercard represented its Systems would do"). The Ferrari is an entirely different car—worth, for reasons having nothing to do with GPS or leather seats, a lot more money than the Toyota. And, as with these two cars, our record is clear that the Intercard and Semnox systems *were* different—perhaps not as different as a Ferrari is to a Toyota, but different nonetheless. Abecassis himself conceded that the machines were different in material ways. Semnox, he explained, was "fully integrated"—and, therefore, didn't require (as Intercard's machines did) A&E to use its Micros point-of-sale system. *See* Abecassis Dep. 80:3–12. And, Abecassis admitted, whereas Intercard used magnetic strips, Semnox deployed radio-frequency identification. *Id.* at 81:7–82:3. How much were the full integration and radio-frequency identification worth? Again, since A&E blocked all discovery on the Semnox transaction, we'll never know.[13] But

---

[13] The only person who was even asked to compare the two machines was Abecassis, who testified—in response to a question about whether the two systems were different—that "I don't know in terms of performance," Abecassis Dep. at 80:21–81:2, suggesting that he didn't know whether the two machines had similar computing power or technology. In that regard, Abecassis would not have been competent to offer a market comparison of the two systems—and there isn't any other evidence in the record, such as an expert report, on this crucial question.

the point here is that A&E cannot simply subtract the price it paid for a 2015 Toyota from the value of a 2018 Semnox and call the difference its "actual damages."

*Three*, A&E doesn't have any evidence for the value of the Ferrari *in 2015*. That may not be so big a deal when it comes to Ferraris because anyone (or so we'd imagine) can go online and see what a Ferrari was worth in 2015. But it *is* a big deal for A&E because none of us has any idea what the Semnox system (our Ferrari stand-in) was worth in 2015. Or, to put it less hyperbolically, someone *probably* knows, but (for whatever reason) A&E decided not to collect any evidence from that someone—which has left the record wholly barren on the critical question of what the Semnox systems were worth back in 2015.

*Four*—and most intractably—our Ferrari example underscores just how little A&E's formula makes sense. Why? Because even if we did know what the Ferrari was worth in 2015, A&E's formula would result in a substantial windfall. To go back to our analogy, A&E paid $50,000—the value of a Toyota—and it *received* a Toyota. If it wanted the benefits of a Ferrari, it would have had to pay $50,000 more. To suggest—as A&E does—that it was damaged in the amount of $50,000 (the value of the Ferrari it wanted minus the value of the Toyota it got) thus ignores reality: Again, to receive that extra $50,000 value, A&E would have had *to pay* $50,000 more—an outlay that, it goes without saying, would have nullified A&E's deficit. A&E thus incurred *no* damage because it got precisely what it paid for—a less advanced (and older) Intercard system. Note, too, that the mathematical flaw in A&E's formula persists if you add the specific wrinkle we have here—namely, that (in 2018) A&E went and bought itself a Ferrari. In that scenario, A&E would have paid $150,000 ($100,000 for the Ferrari and $50,000 for the Toyota), and it would have received $150,000-worth in cars. If we were to give A&E what it asks for here—i.e., the delta between the Ferrari and the Toyota ($50,000)—A&E would end up with $200,000 ($150,000 in cars and $50,000 from the court system) after having spent only $150,000. FDUTPA isn't an arbitrage scheme.

At most, then, A&E can show that, in 2015, it paid Intercard less ($272,706.08) for an older product with fewer features than it paid Semnox in 2018 ($393,452.00) for a newer product with more (and better) features. *See* Pl.'s SOMF ¶¶ 32–33, 89. Was this $120,000 discount (about 30% of the Semnox price) an accurate reflection of the disparities between the two products? Was there a general increase in industry pricing as a result of the integration of more advanced technologies? Or was this appreciation the result of some other factor—such as industry consolidation or the introduction of anti-competitive forces? On this barren record, none of us—and, more importantly, no jury—could ever say. The only thing we really can say is that A&E's position is wrong—that its $120,000 *savings* cannot be the measure of its damages *both* because it never outlaid that $120,000 *and* because we have no reason to believe that the 2018 Semnox is an adequate stand-in for the *value of the* product A&E wanted in 2015.

And, since A&E has no evidence of what its actual damages are, Intercard is entitled to summary judgment. *See, e.g.*, *Anderson v. Am. Family Ins. Co.*, 800 F. App'x 814, 816 (11th Cir. 2020) (holding that the defendant was entitled to summary judgment when the plaintiff failed to adduce evidence of diminished value and relied on an appraisal that lacked a factual basis, rendering the damages calculation a "mere conclusion" at the "highest level of abstraction"); *Donoff v. Delta Air Lines, Inc.*, 2020 WL 1226975, at *10 (S.D. Fla. Mar. 6, 2020) ("Failure by a plaintiff to present evidence of actual damages entitles a defendant to summary judgment." (citing *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)).[14]

---

[14] *See also McGuire v. Ryland Grp., Inc.*, 497 F. Supp. 2d 1347, 1355 (M.D. Fla. 2007) ("Plaintiff's FDUTPA claim fails because she has not presented any competent evidence of the difference in the market value had the house had a stucco exterior versus the actual TCF exterior of Plaintiff's house."); *W. P. Simpson Co. v. Crompton-Richmond Co.*, 210 So. 2d 467, 468 (Fla. 3d DCA 1968) ("[N]otwithstanding the finding by the jury that the goods as received were not of the quality represented, if there is no evidence upon which the true value of the goods as received may be ascertained then their verdict was erroneous and the judgment N.O.V. should be sustained.").

C.      "Other" Actual Damages

Having failed to produce evidence that the software was completely valueless or, alternatively, that the market value of Intercard's system as delivered was less than its value as promised, A&E argues that "actual damages" under FDUTPA are a "much broader concept." Response at 13. And, it says, those "broader" damages may encompass "the amounts that A&E paid to Intercard for hosting and other services, and to a third party for game cards that are useless without the Defective Systems," as those are "sums A&E would not have spent but for Intercard's wrongful conduct." *Id.* at 14; *see also id.* at 7 (claiming that, "[h]ad A&E not purchased the Defective Systems, it would not have been required to pay Intercard an additional $71,602.04, on top of the systems' purchase price, for hosting and other goods and services related to those systems").

A&E is wrong to suggest that "actual damages" under FDUTPA may be "broader" than diminution in value. Florida courts have repeatedly held that, except for the narrow "valueless" exception we discussed earlier, FDUTPA damages are *limited* to the product's diminution in value. *See, e.g.*, *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824–25 (Fla. 4th DCA 2010) ("Proof of actual damages is necessary to sustain a FDUTPA claim. The statute does not allow the recovery of other damages, such as consequential damages." (citing *Rollins*, 454 So. 2d at 585)); *Rodriguez*, 38 So. 3d at 180 ("[U]nder FDUTPA, the term 'actual damages' does not include special or consequential damages."); *Orkin Exterminating*, 872 So. 2d at 263 (noting that FDUTPA "permits a consumer to recover only the diminished value of the services received," and not "special, consequential, and incidental damages"). The one case on which A&E relies for the proposition that FDUTPA damages are "broader" than diminution in value is *Bidon v Department of Professional Regulations, Florida Real Estate Commission*, 596 So. 2d 450, 452 (Fla. 1992), which dealt only with the Florida Real Estate Recovery Fund Statute, FLA. STAT. § 475.482(1), and had nothing to say about "actual damages" under FDUTPA.

25

As we've explained, A&E has waived any damages claim that's premised on money it paid to third parties for game cards—regardless of whether those damages would have been cognizable under FDUTPA. Nor can A&E recover the sums it paid Intercard for "hosting and other services" because A&E agrees that this was money it "would not have spent *but for* Intercard's wrongful conduct." Response at 14 (emphasis added). In saying so, of course, A&E implicitly concedes that these payments constitute consequential damages. *See* FLA. STAT. § 672.715(2) (defining a buyer's consequential damages as "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise"). In other words, A&E treats Intercard's "hosting and other services," not as part of the overall package it purchased from Intercard in 2015, but as a series of subsequent (read: consequential) transactions. We note, in this respect, that A&E omits these costs from what it calls its "diminution damages." Response at 10–11 (calculating the "diminution damages" as the difference between the Semnox purchase price and the $272,706.08 A&E paid for the Intercard systems, but (notably) omitting the $71,602.04 A&E spent on "hosting and other services"). Assuming, then—as A&E seems to do—that those $71,602.04 are consequential damages, they're simply unavailable under FDUTPA.

Elsewhere, however, A&E appears to suggest that the sums it paid Intercard for "hosting and other services" *do* constitute a series of purchases that diminished in value and for which it is entitled to "diminution damages" under FDUTPA. It argues that, "as a consequence of the systems' defects, the value of the hosting and other services was also impaired," and contends that A&E did not "obtain the full benefit of Intercard hosting A&E's data because the data did not accurately reflect the transactions and contain full histories, and because A&E could not generate accurate reports from that data." *Id.* at 14. But the Complaint nowhere alleges that A&E made subsequent purchases for "hosting and other services" from Intercard or that those subsequent purchases diminished in value

because of the Intercard systems' defects. *See generally* Complaint. And it is well-settled that "a party may not raise a new theory for the first time in response to a summary judgment motion." *Cruz v. Advance Stores Co.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012).

More problematically, even if A&E had alleged this theory of damages in its Complaint—or, alternatively, even if the "hosting and other services" could be considered part of A&E's 2015 purchase—the FDUTPA claim would still fail for want of damages. A&E, again, hasn't submitted any evidence regarding the value of this "hosting and other services." Instead, A&E merely re-cites the systems' various software defects, which Intercard doesn't contest. *See* Response at 14 (citing Pl.'s SOMF ¶¶ 71–74, 76). But A&E makes no effort to connect those defects to the *value* of the "hosting and other services." That is, it doesn't attempt to *quantify* its damages. *See generally id.* Indeed, there doesn't appear to be any record evidence regarding these "hosting and other services" at all, other than (1) the Abecassis Declaration in support of A&E's opposition to summary judgment, which asserts only that A&E is seeking $71,602.04 for those services, *see* Abecassis Decl. [ECF No. 98-1] ¶ 4; and (2) a spreadsheet appended to that declaration, which purports to "detail[ ] the dates and amounts of the [relevant] payments," *see id.* at Ex. 1.

That's simply not enough evidence for a reasonable jury either to ascertain injury or to quantify damages. To see why, assume for a moment that the $71,602.04 could establish the market value of the "hosting and other services" *as promised*. Even in that scenario, we would have no evidence about the market value of those items *as delivered*. Abecassis never offered any such opinion,[15] and (again) A&E retained no expert on the subject. In short, A&E's bare conclusion that it "did not obtain the full benefit" of these "hosting and other services" is insufficient to withstand summary judgment. *See*

---

[15] Abecassis, in fact, never testified about these expenses at all. *See generally* Abecassis Dep.

*Anderson*, 800 F. App'x at 816 (holding that the defendant was entitled to summary judgment when the plaintiff failed to submit evidence of diminished value of property).

To summarize, then: A&E's claim for reimbursement of the money it paid to Intercard for "hosting and other services" fails for three reasons: *one*, because A&E seems to characterize these payments as consequential damages, which are unavailable under FDUTPA; *two*, because, even if these losses weren't consequential, A&E's claim to them appears nowhere in its Complaint; and *three*, because, even if these losses weren't consequential and even if they appeared in the Complaint, A&E has no evidence of "diminution"—no evidence, in short, that the value of these "hosting and other services" as *promised* differed from their value *as delivered*.

### D.    Promises to Repair

Finally, we reject A&E's theory that it can sustain its subsidiary FDUTPA claim—that Intercard's promises to repair the systems were *themselves* deceptive and injurious. *See* Response at 14–15. A&E premises its promises-to-repair theory of damages on the expenditure of "subsequent costs"—specifically, "$63,018.82 for hosting and other items" and "$48,068.07 on game cards that can only be used with the Systems." Response at 15.[16] But, as we've just discussed, the former represents a theory of damages that doesn't appear in the Complaint, isn't cognizable under FDUTPA, and for which A&E has adduced *no* evidence. The latter, of course, A&E has unambiguously waived. *See* Dec. 3, 2019 Email; Opp'n to Def.'s Mot. Compel at 3.[17]

---

[16] We assume that this is a scrivener's error and that A&E intended to refer to the same $71,602.04 and $83,066.61 we discussed above. After all, these figures—$63,018.82 and $48,068.07—do not appear anywhere else in the record. *See generally* Response; Pl.'s SOMF; Abecassis Decl.; Abecassis Dep.

[17] Since we reject A&E's damages claim, we needn't address Intercard's separate argument that its promises to repair were neither deceptive nor unfair. *See* MSJ at 10–11 (arguing that Intercard is entitled to summary judgment because there's no evidence that the promises to repair were deceptive); Response at 14 (contending that "there is ample record evidence that Intercard's promises to repair were, in fact, deceptive").

\*\*\*

For all these reasons, Intercard's MSJ as to Count IV is **GRANTED**.

### III.    Express Warranty (Count I) & Implied Warranty (Count II)

The elements of a claim for breach of express warranty under Florida law are: (1) a sale of goods; (2) an express warranty relating to those goods; (3) a breach of that express warranty; (4) notice to the seller of the alleged breach; and (5) damages sustained by the buyer as a result of the breach. *See Jovine*, 795 F. Supp. 2d at 1339–40. A claim for breach of the implied warranty of merchantability requires proof that: (1) the plaintiff was a foreseeable user of the product; (2) the plaintiff used the product in the intended manner at the time of injury; (3) the product was defective when the warrantor transferred it to the plaintiff; and (4) the defect caused the plaintiff's injuries. *Id.* at 1340.

Again, the issue comes down to proof of damages—an element of both counts. *See, e.g.*, *Hache v. Damon Corp.*, 2008 WL 2157057, at *2 (M.D. Fla. May 20, 2008) ("Under Florida law, the existence of damages is an essential element to a claim for breach of a warranty contract. As Plaintiffs are barred from introducing evidence of damages, no genuine issue of material fact exists on the issue of damages. Accordingly, the Court concludes Defendant is entitled to summary final judgment.").

Warranty damages are governed by FLA. STAT. § 672.714 (codifying U.C.C. § 2-714), which provides as follows:

> (1) Where the buyer has accepted goods and given notification (s. 672.607(3)) he or she may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

The breach-of-warranty statute's damages provision is thus broader than FDUTPA's. Nevertheless, in the typical case, subsection (2)—the difference between the product as warranted and the product as delivered—will determine the buyer's damages. *See* 45 FLA. JUR. 2D SALES AND EXCHANGES OF GOODS § 245 (Mar. 2021 Update) (explaining that "the measure of damages for a breach of warranty is the difference, at the time and place of acceptance, between the value of the goods accepted and the value that they would have had if they had been as warranted"). But, under subsection (2), "special circumstances" may allow for "proximate damages of a different amount." Moreover, subsection (1) provides broadly for damages calculated "in any manner which is reasonable"—so long as the buyer has notified the seller of the defect, under FLA. STAT. § 672.607(3), "within a reasonable time after he or she discovers or should have discovered any breach." Subsection (3) provides, where appropriate, for incidental or consequential damages.

For two reasons, Intercard is entitled to summary judgment on Counts I and II. *First*, A&E accepted delivery of the Intercard systems, used them for three years, and then resold some of their hardware components. Since it never rejected (or revoked its acceptance of) Intercard's systems, it cannot recover their total purchase price. Nor can A&E pursue, as "replacement costs," the extra money it paid for the Semnox systems in 2018. Since A&E used the Intercard systems for three years and then resold some of their component parts, any award that includes the full purchase price of the Semnox systems would gift A&E an unjustified windfall. And, even if that weren't true, as we've said, A&E has waived any claim to damages it might have had with respect to monies it paid to third parties, including Semnox. *Second*, A&E's requests for diminution-in-value and other damages fail for many of the same reasons we've outlined above—namely, A&E's failure to produce evidence of diminution and its waiver of any claim premised on amounts paid to third parties.

### A.     Purchase Price and Replacement Costs

A&E wants to recover the purchase price of the Intercard systems—$272,706.08—because it was "*A&E's choice* whether to sue for the purchase price or for the difference in value between the [Intercard systems] as delivered and as warranted." Response at 17. But a buyer must properly reject nonconforming goods—or timely revoke its acceptance—before he can rescind the contract and obtain a full refund. *See* Fla. Stat. § 672.711 (where a "buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract the buyer may cancel [the rest of the contract] and whether or not he or she has done so may in addition to recovering so much of the price as has been paid: (a) 'Cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or (b) Recover damages for nondelivery as provided in this chapter" (cleaned up)).

It's undisputed that, as early as 2016, A&E knew that the Intercard systems were defective. *See* Pl.'s SOMF ¶ 80 (noting that Abecassis emailed Intercard on February 21, 2016 about Intercard's "attempt to resolve" the systems' defects). And yet, A&E didn't reject the systems (or revoke its acceptance) until 2020. *See* Abecassis Decl. at Ex. 4 (appending a letter from Intercard's attorney, rejecting A&E's purported February 24, 2020 revocation). Recognizing this problem, A&E now insists that it would have rejected the Intercard systems in 2016 were it not for Intercard's promise to cure the defects, and that it "has since attempted to return" the systems to Intercard. *See* Response at 18. It's true that a buyer may accept a good—as A&E did—and later revoke acceptance based "[o]n the reasonable assumption that its nonconformity would be cured and it ha[d] not been seasonably cured." Fla. Stat. § 672.608(1)(a). But the buyer's revocation "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods[.]" § 672.608(2). Notably, the revocation "is not effective until the buyer notifies the seller of it." *Id.*

31

One problem for A&E—as with so many of its other arguments—is that its Complaint never mentions this new theory of "attempted" revocation. *See generally* Complaint. Nor could it have. A&E admits, after all, that it didn't "attempt[ ]" to revoke acceptance until February 24, 2020—more than one year into this litigation, almost five years after it first accepted delivery of the systems in 2015 (and early 2016), and about two years *after* it had already begun reselling the systems' hardware components to third parties. *See* Def.'s SOMF ¶ 10 ("The Intercard system was installed at the Miami location in June 2015 and in the Ft. Myers and Tampa locations in late 2015 to early 2016."); *id.* ¶¶ 44–45 (noting that A&E resold certain hardware components in 2018). A&E's only evidence of the "attempted" revocation, moreover, is a March 11, 2020 letter from Intercard's attorney, rejecting the purported February 24, 2020 revocation. Although A&E offered this letter as an exhibit to the Abecassis Declaration, which it submitted in opposition to Intercard's MSJ, it (bizarrely) never attached the letter *its lawyer* sent to Intercard. *See* Abecassis Decl. at Ex. 4. As this procedural history makes plain, A&E's new theory of "attempted" revocation fails in four ways.

*First*, as the Eleventh Circuit has (repeatedly) said, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

*Second*, we have no evidence of the revocation notice itself—principally because A&E failed to submit it. And that notice is necessary to establish the effectiveness of the revocation. *See* FLA. STAT. § 672.608(2); *see also Golden Needles Knitting & Glove Co. v. Dynamic Mktg. Enters., Inc.*, 766 F. Supp. 421, 428 (W.D.N.C. 1991) (explaining that, under Florida law, the notice requirement in cases of revocation is more stringent than in the context of rejection, and finding, as a matter of law, that a buyer failed to effectively revoke acceptance where the only evidence was a letter, "which fail[ed] to state in sufficient detail the reason for the revocation"); 45 FLA. JUR. 2D SALES AND EXCHANGES OF

GOODS § 147 (Mar. 2021 Update) ("The notice requirement [for revocation] is a valid precondition to imposing liability on the seller.").

*Third*, A&E's revocation is untimely as a matter of law. A&E accepted the systems in 2015 and early 2016. Def.'s SOMF ¶ 10; Pl.'s SOMF ¶ 10 ("Undisputed"). Intercard tried to fix the systems' defects as early as February of 2016. *See* Pl.'s SOMF ¶ 80 (noting that Abecassis emailed Intercard on February 21, 2016 about Intercard's "attempt to resolve" the systems' defects). According to A&E, the problems persisted until November of 2017, when "A&E concluded that Intercard would never fulfill its promises to resolve the Defective Systems' defects, and on that basis decided to transition to a new platform." *Id.* ¶ 85. So, on November 30, 2017, A&E sent Intercard an email, explaining that it would be "utilizing a different provider for this and other upcoming project[s]." Def. SOMF ¶ 18.

In other words, as of November of 2017 (at the latest),[18] A&E knew about the defects and informed Intercard that it would be replacing the systems. It was thus unreasonable for A&E to wait 28 *more* months (and one year into this litigation) to tender its notice of revocation. In most cases, admittedly, "the reasonableness of the delay [in revocation] is a fact question." *Central Fla. Antenna Serv., Inc. v. Crabtree*, 503 So. 2d 1351, 1353 (Fla. 5th DCA 1987). But, "in some cases, the validity of a revocation is decided as a matter of law." *Absolute Trading Corp. v. Bariven S.A.*, 503 F. App'x 694, 697 (11th Cir. 2013) (citing *Royal Typewriter Co., a Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1106 (11th Cir. 1983)). In *Crabtree*, for example, a buyer waited one-and-a-half years *after* he became aware of the product's defects, which "foreclose[d] his remedy of revocation as a matter of law." *Crabtree*, 503 So. 2d at 1353.

Although it asks for the full purchase price of the 2015 Intercard systems, A&E never argues that its revocation of those systems was timely. *See generally* Response. It has thus waived any such

---

[18] We say "at the latest" because there's evidence that A&E knew about the defects as early as February of 2016—when Intercard was called out to fix the problems. *See* Pl.'s SOMF ¶ 80.

argument. *Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). We do note, though, that there are cases in which, despite some delay between acceptance and revocation, disgruntled buyers-cum-plaintiffs have survived summary judgment. In some of those, the buyers continuously asked for repairs for a time until, seeing no progress, they threw up their hands and *immediately* revoked. *See, e.g.*, *Bair v. A.E.G.I.S. Corp.*, 523 So. 2d 1186, 1189 (Fla. 2d DCA 1988) (holding that a revocation two years after acceptance was effective because the buyer "continually complained to [the seller] regarding the boat's problem from the time it was discovered *to the moment he revoked his acceptance*" (emphasis added)); *Money Mortg. & Inv. Corp. v. CPT of S. Fla., Inc.*, 537 So. 2d 1015, 1016 (Fla. 3d DCA 1988) ("During the next eighteen months, [the seller] attempted to cure the problem . . . . *When these efforts failed*, [the buyer] revoked its acceptance." (emphasis added)). Similarly, and unsurprisingly, courts have found a delay in revocation justified when the buyer faced certain obstacles that prevented him from discovering the defect in the first instance. *See Absolute Trading*, 503 F. App'x at 698 (explaining that a delay in revocation was reasonable where there were "several obstacles" to testing the product).

But those cases—even had A&E cited them—suggest only that it would have been reasonable for A&E to revoke its acceptance in *November of 2017*, almost two years after its initial acceptance in 2015 (and early 2016). These cases, however, don't help A&E with the 28-month delay that followed. And that's because, whatever "a reasonable time" means in this context, it cannot mean that a buyer may use the product profitably for three years, replace the product *because of* its defects, sell certain components of the product, file a lawsuit about the product's defects, and only then—five years after first accepting the product, many years after discovering the defect, and one year after suing over it— revoke acceptance. The purpose of timely notification, after all, is to "provid[e] opportunity for adjustment or settlement." *Exim Brickell LLC v. PDVSA Servs. Inc.*, 516 F. App'x 742, 753 (11th Cir. 2013) (citing J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 9–4, at 431 (6th ed. 2010)).

Ignoring A&E's substantial and unexcused delay—and, most especially, the revocation's appearance more than a year into this federal litigation—would contravene that sensible policy objective here.

*Fourth*, A&E's conduct was not at all consistent with revocation, as it continued to use the systems at its gaming locations until 2018. Def.'s SOMF ¶¶ 23–25; Pl.'s SOMF ¶¶ 23–25 (not disputing this point). A&E then resold the systems' hardware components to third parties and began replacing the Intercard machines with Semnox systems. Def.'s SOMF ¶¶ 44–45; Pl.'s SOMF ¶¶ 44–45 (not disputing these points). A&E cannot claim to revoke acceptance long after it used the goods for years and then resold their component parts. *See, e.g.*, *B.P. Dev. & Mgmt. Corp. v. P. Lafer Enters., Inc.*, 538 So. 2d 1379, 1381 (Fla. 5th DCA 1989) (the buyer's "actions in displaying and using the decorations for its own benefit throughout the Christmas season is inconsistent with its claimed revocation"); *Golden Needles Knitting & Glove*, 766 F. Supp. at 428 (rejecting claim of revocation as a matter of law where the buyer's "subsequent activities following the letter [of revocation] indicate that it did not intend to revoke acceptance"; these included the buyer "never attempt[ing] to return the gloves or indicat[ing] to [the seller] that it desired to return the gloves").

A&E, in sum, did not properly revoke acceptance and is not entitled to the full purchase price of the Intercard machines under FLA. STAT. § 672.711.[19]

For all these same reasons, A&E isn't entitled to the *greater* sum of $393,452.00—the full purchase price of the Semnox machines. *See* Response at 16; *see also* FLA. STAT. § 672.711 (providing

---

[19] A&E points out that "there is *zero* record evidence that the Defective Systems enabled A&E to make any money that it would not otherwise have made had it been operating its centers using coins instead of the systems." Response at 18. Fair enough. But this just means that A&E may *once* have had the right to revoke its acceptance, even though the Intercard systems were generally functional and retained some objective commercial value. *See Barrington Homes of Fla., Inc. v. Kelley*, 320 So. 2d 841, 843 (Fla. 2d DCA 1975) ("[T]he impairment spoken of is that suffered by the purchaser himself which, of course, must be subjectively measured from the standpoint of the purchaser."). No one disputes that. The issue, rather, is whether, given that opportunity, A&E timely and effectively notified Intercard of the revocation. Because it did not, it has no legal basis to recoup the full purchase price here.

that the buyer must "rightfully reject[ ] or justifiably revoke[ ] acceptance" to obtain "cover"); §
672.712(1) ("After a breach within the preceding section, the buyer may 'cover' by making in good
faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in
substitution for those due from the seller.").

Moreover, because A&E accepted and used the Intercard systems—and then resold some of
their hardware components—awarding A&E $393,452.00 would put A&E in a (much) better position
than it would have been in had it properly rejected the Intercard machines, rescinded the contracts,
and sued for $272,706.08 in November of 2017. *Cf. Rector v. Larson's Marine, Inc.*, 479 So. 2d 783, 785
(Fla. 2d DCA 1985) (explaining that, in a breach-of-contract case, the plaintiff may "treat the contract
as void and seek the damages that will restore him to the position he was in immediately prior to
entering the contract" or, alternatively, "elect to affirm the contract, insist upon the benefit of his
bargain, and seek the damages that would place him in the position he would have been in had the
contract been completely performed"). Were a jury to award A&E $393,452.00, after all, A&E would
(in effect) receive three free Semnox machines *plus* the money it earned when it resold Intercard's
hardware components.[20] *See Koplowitz v. Girard*, 658 So. 2d 1183, 1184 (Fla. 4th DCA 1995) (reversing
the trial court's order awarding the buyer *both* the money it paid the seller *and* the full cost of replacing
the product because the award "placed [the] buyer in a better position than it would have been had
the contract been fully performed"—and thereby gifted the buyer a free product).[21]

---

[20] The math here isn't too complicated. A&E paid $666,158.08 ($272,706.08 for the Intercard systems
and $393,452.00 for Semnox), and it received six machines worth the same amount of money, *see* Pl.'s
SOMF ¶ 36 (conceding that the Intercard systems were worth what A&E paid for them). If we were
to return its $393,452.00, therefore, A&E would (in essence) have paid $272,706.08 for six machines
worth $666,158.08.
[21] *Koplowitz* did not, as A&E suggests, hold that a buyer is necessarily entitled to the defective product's
replacement costs, less the balance due under the contract. *See Koplowitz*, 658 So. 2d at 1183. At most,
the case stands for the proposition that, to avoid giving the buyer a windfall, the money the buyer
owed the seller must be set off against the buyer's damages. *See id.* at 1185 (explaining that, because
"the trial court did not set off the balance due under the contract"—and "instead . . . refunded buyer

None of this really matters, though, because—as we've said—A&E has waived any claim it might have had for payments it made to third parties, *including* Semnox. *See supra* Section I.

### B.   Diminution and Other Damages

A&E's failure to reject or revoke acceptance "does not necessarily preclude [A&E] from making a claim for breach of warranty." *B.P. Dev. & Mgmt. Corp.*, 538 So. 2d at 1381. Unfortunately for A&E, though, its warranty claims fail in the same ways—and for the same reasons—as its FDUTPA claims did. Specifically, A&E cannot use its diminution-in-value formula—the same formula we rejected in the context of the FDUTPA claim—to survive summary judgment.

Recall that A&E wants "the difference in value between what it paid for the non-conforming Defective Systems and what it paid for the Semnox systems that actually performed the functions warranted by Intercard." Response at 18 (applying this illogical formula to the warranty claims). Again, A&E's formula fails to establish that it suffered any damages.[22] For one thing, it concedes that it got what it paid for. *See* Pl.'s SOMF ¶ 36 ("Mr. Abecassis *could and did* testify that the Defective Systems as delivered were worth what A&E paid."). For another, it has no evidence that the Semnox systems in 2018 were an adequate stand-in for the machines A&E wanted in 2015.

And, again, while a party asserting a warranty claim may pursue incidental and consequential damages, A&E has waived any claim to damages it might have had for payments it made to third parties. *See supra* Section I. It also did not raise its cost-of-hosting-and-other-services theory until its

---

the amounts paid *and* awarded the full cost of remedying the breach"—the "buyer impermissibly received more than its bargain"). In any event, *Koplowitz* dealt with altogether different facts. In that case, "the computer system installed by [the] seller failed to perform all functions contemplated by the parties in entering the contract and, as such, [the] buyer was required to hire another computer specialist to repair the system." *Id.* at 1183. Here, by contrast, A&E did not immediately pay to repair or replace the Intercard systems. Instead, A&E used the systems for more than three years (earning money the whole time) and then resold the systems' hardware components—thus translating the systems into *more* money. A&E cites no case for the proposition that, given these or similar facts, it can recover the full replacement costs. *See generally* Response.

[22] For much more on this, see *supra* Section II.B.

opposition to summary judgment, *see supra* Section II.C, and otherwise failed to adduce *any* evidence for these services' diminution in value, *see id.*—all independent reasons for dispensing with its claims. *See, e.g.*, *Thomas v. Winnebago Indus., Inc.*, 2017 WL 2348789, at *4 (M.D. Fla. May 30, 2017) (granting summary judgment for the defendant on a breach-of-warranty claim where the plaintiff "proffer[ed] no appraisal" of the defective product and no other "competent evidence about damages,"—and so, the jury would have had to "speculate impermissibly about the diminution in value").

***

Before moving on, we address one case, *Kia Motors America, Inc. v. Doughty*, 242 So. 3d 1172 (Fla. 2d DCA 2018), which neither party cites. The case is instructive, though, because it shows that a plaintiff advancing a diminution-in-value theory of damages under Florida law must have evidence of the amount of that diminution. In *Doughty*, a couple purchased a car with a warranty for $21,000. *Id.* at 1174. Because the car was defective, they eventually sued for breach of warranty. *Id.* at 1175. At trial, the couple put on evidence of *both* the $21,000 purchase price *and* the car's various defects, such as a grinding noise and loss of power. *Id.* at 1174. They also established that the dealership failed to repair the defects under the warranty, and that they were unable to *either* trade the car into the dealer *or* sell it privately, even at a substantial discount. *Id.* The jury awarded the couple $15,000 in diminution damages. *Id.*

On appeal, the Second DCA agreed that the couple had proven the first variable of the diminution calculation—the value of the car *as warranted* at the time and place of acceptance. *See id.* at 1176 ("[T]he parties agree that by proving the price they paid for the car, [the couple] presented sufficient evidence of the first variable—the value of the car as warranted at the time and place of acceptance."). The couple, however, had failed to establish the value of the car *as delivered. Id.* Although the husband had testified about the car's defects at trial, he "was never asked his opinion as to the value of the car in its defective condition, and there [was] thus no record that would permit [the court]

to affirm on this basis." *Id.* at 1176 n.2. Curiously, while the husband was asked about some research he may have conducted about the value of the car, his attorney successfully objected to that line of questioning. *Id.*

The couple argued on appeal that their inability to trade in or sell the car (two years after they bought it) was evidence of the diminution. *Id.* at 1176. The DCA disagreed, noting that "neither of those facts would permit a jury to determine what the value of the car was at the time and place [the couple] received it from [the defendant]." *Id.* at 1176–77; *see also id.* at 1177 ("Any conclusion about value at the time and place of acceptance that a jury might draw from these facts would be nothing but speculation, which is an impermissible basis for an award of damages."). The court stopped short of requiring warranty plaintiffs to submit an expert's opinion about the amount of the diminution—though, by mentioning it, the court did imply that expert testimony would have been helpful in the absence of relevant testimony from the car owners. *Id.* In any case, finding no competent evidence of the amount of diminution, the court reversed the jury's damages award. *Id.* The case thus stands for the uncontroversial proposition that a warranty plaintiff must present competent evidence of the value of the defective product as delivered. Since A&E hasn't done that here, its damages claims fail.

But the case is also significant for another reason. Rather than reverse the judgment for the plaintiffs, the court in *Doughty* reversed only the damages award and remanded the case for the trial court to award the plaintiffs *nominal* damages. *See id.* That was because, although the evidence was insufficient to *quantify* the damages, it "was sufficient to establish that their car was worth less than it would have been had it been delivered as warranted." *Id.*; *see also Rooney v. Skeet'r Beat'r of Sw. Fla., Inc.*, 898 So. 2d 968, 970 (Fla. 2d DCA 2005) ("Because the damages could not be determined with any degree of certainty on the evidence presented, we reverse the compensatory damage award and remand with directions that judgment be entered . . . for nominal damages." (cleaned up)); *Abstract Co.*

*of Sarasota v. Roberts*, 144 So. 2d 3, 5 (Fla. 2d DCA 1962) (holding that a complaint for breach of warranty is sufficient to sustain an award of nominal damages).

A&E never suggests that it's entitled to *nominal* damages, *see generally* Response, so it has forfeited any such argument. *Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). But we add one thing: Although there may be evidence that the Intercard systems were worth less than warranted—Intercard, after all, concedes that the software was defective, *see* Def.'s Reply SOMF ¶¶ 71–78—A&E's own characterization of its damages fails to establish an economic injury. This is so for two reasons. *First*, as we've noted, A&E admits that "Mr. Abecassis *could and did* testify that the Defective Systems as delivered were worth what A&E paid." Pl.'s SOMF ¶ 36. *Second*, even ignoring this concession, A&E refers to its damages as the difference between the value of the Semnox systems in 2018 and the value of the Intercard systems in 2015. As we've said, this formula fails to show that A&E was damaged at all.

For all these reasons, then, Intercard's MSJ as to Counts I and II is **GRANTED**.

## IV.    Promissory Estoppel (Count III)

A cause of action for promissory estoppel requires proof that (1) "the plaintiff detrimentally relied on the defendant's promise," (2) "the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance by the plaintiff," and (3) "injustice can only be avoided by enforcement of the promise." *Frayman v. Douglas Elliman Realty, LLC*, 2021 WL 299951, at *19 (S.D. Fla. Jan. 25, 2021) (citing *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 302 (Fla. 1st DCA 1999)).

In its Complaint, A&E alleged that, in reliance on Intercard's promises to repair the systems, A&E elected not to replace the systems and, therefore, "sustained losses . . . for sales that A&E was

unable to make due to the Systems' malfunctions." Complaint ¶ 44. A&E concedes that it has waived any claims to those lost sales. *See* Response at 10 ("A&E has represented to Intercard and stated on the record that it *is not seeking the lost profits* or lost productivity[.]"). Nevertheless, it maintains that it didn't need to plead a specific category of damages as part of its promissory-estoppel claim. *See id.* at 20 (arguing that "general damages which naturally and necessarily flow from the injuries alleged may be proved although not pleaded"). In opposing summary judgment, therefore, A&E contends that, in reliance on Intercard's promises, it incurred "subsequent costs for hosting, game cards, and other System-related expenses[.]" *Id.*

But A&E never explains how those "subsequent costs" were detrimental to its business. *See generally id.* Nor is there anything in the record from which the Court could reasonably infer that they were. As we've explained, Abecassis never testified about "hosting and other services," *see generally* Abecassis Dep.—much less about the value (he believes) the company did (or didn't) receive in return for those payments. Indeed, the subsequent payments for "hosting and other services" may well have inured to A&E's benefit. A&E, after all, used the Intercard systems for more than three years to generate income for its business, *see* Pl.'s SOMF ¶ 11, and the "hosting and other services" may have been necessary to the continued operation of those machines. In either event, A&E's baseless suggestion that it didn't obtain the "full benefit" of those subsequent purchases, *see* Response at 14, is simply not supported by *any* record evidence.

On this point, *Munro v. Futch*, 2007 WL 9702306 (S.D. Fla. Feb. 27, 2007), is instructive. There, the plaintiff asserted a claim of promissory estoppel based on the defendants' alleged promise—later broken—to make her a partner in a business venture and to provide her with substantial income. *Id.* at *3–5. To establish detrimental reliance, the plaintiff pointed to some debt she'd incurred for the purchase of a new home in Florida, where she relocated after she'd sold her old house in South Carolina. *Id.* The court granted the defendants' motion for summary judgment, in part, because the

plaintiff "failed to present evidence that she suffered any detriment in reliance on the defendants' representations." *Id.* In particular, the court said, "she ha[d] not tried to sell her Florida home, she [did] not know its value, and she admitt[ed] that the price of her Florida home increased after she purchased it, though she . . . believe[d] its value ha[d] [since] declined." *Id.* Nor, the court added, did the plaintiff show that the value of her old home had increased since she'd sold it, *id.*—a fact that (we suppose) might have shown detriment as a kind of lost opportunity cost. Our case is similar: A&E has failed to provide any evidence about the value of Intercard's "hosting or other services"—and, as such, has failed to meet its burden here.[23]

  Intercard's MSJ as to Count III is, therefore, likewise **GRANTED**.

***

  After careful review, the Court hereby **ORDERS AND ADJUDGES** as follows:

---

[23] We thus need not address Intercard's argument that A&E's estoppel claim can't be based on Sherrod's promise to repair because, as Intercard says, the promise was a truthful representation about a *future* intention. *See* MSJ at 14. Still, we make two observations. *First*, there likely is sufficient evidence in the record to raise a factual question about the truthfulness of Intercard's promise—namely, (1) Abecassis's testimony that Intercard didn't do what was necessary to fix the problems, and (2) the undisputed fact that Intercard ultimately failed to fix the problems. *Second*—and cutting the opposite way—although Intercard doesn't make this argument directly (probably because it focuses on Intercard's intent, rather than on the content of the promise itself), it seems likely that the promise was indefinite as a matter of law, such that A&E couldn't have reasonably relied on it. *See W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924–25 (Fla. 1989) (explaining that a promise must be "sufficiently definite in time or term" to trigger promissory estoppel); *see also Vencor Hosps. v. Blue Cross Blue Shield of Rhode Island*, 284 F.3d 1174, 1185 (11th Cir. 2002) (affirming summary judgment where the plaintiff "introduced no evidence that any such representations were definite, nor tha[t] any reliance thereon would be reasonable"); *W. Indies Network-I, LLC v. Nortel Networks, (CALA) Inc.*, 243 F. App'x 482, 485 (11th Cir. 2007) (affirming summary judgment on promissory estoppel claim where the plaintiff "failed, as a matter of law, to proffer sufficient evidence to show clearly and convincingly that [the defendant's] statements constituted definite promises that reasonably induced reliance"). Sherrod didn't offer any terms, didn't explain how Intercard would repair the systems, and didn't say anything about when the repairs would be completed. *See Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, 2011 WL 653524, at *25 (M.D. Fla. Feb. 14, 2011) (granting summary judgment where the defendant made promises "offering to resolve issues" with defective buses it had sold to the plaintiff, as those promises—"assuring that [the defendant] could—and would—resolve issues" and that it "would help"—were indefinite as a matter of law, insofar as they "failed to disclose what actions [the defendant] would take and when").

1.  Intercard's Motion for Summary Judgment [ECF No. 79] is **GRANTED**.

2.  Pursuant to FED. R. CIV. P. 58, the Court will enter final judgment separately.

3.  The Clerk of Court shall **CLOSE** this case.

4.  All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 25th day of March 2021.


**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record